## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

NATIONAL TREASURY EMPLOYEES UNION  )
1750 H Street, N.W.  )
Washington, D.C. 20006  )
  )
        Plaintiff,  )
  )
      v.  )    Case No. <u>1:18-cv-649-CMH/MSN</u>
  )
DONALD J. TRUMP,  )    COMPLAINT FOR
President of the United States,  )    DECLARATORY AND
1600 Pennsylvania Avenue, N.W.  )    INJUNCTIVE RELIEF
Washington, D.C. 20035,  )
  )
and  )
  )
JEFF T.H. PON,  )
Director of the Office of Personnel Management  )
1900 E Street, N.W.  )
Washington, D.C. 20415  )
        Defendants.  )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor organization that represents approximately 150,000 federal government employees by negotiating collective bargaining agreements with their agency employers, advocating for legislation that improves the working lives of federal employees, and engaging in general advocacy for federal employees' rights.

On May 25, 2018, Defendant Donald J. Trump issued a trio of executive orders targeting federal sector labor organizations and the employees whom they represent. Portions of two of these executive orders—"Executive Order Ensuring

Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use"
and "Executive Order Promoting Accountability and Streamlining Removal
Procedures Consistent with Merit System Principles"—are plainly unlawful because
they conflict with federal statute.

"The Founders of this Nation entrusted the lawmaking power to the Congress
alone . . . ." <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 589 (1952). In
this complaint, NTEU challenges the President's efforts to usurp Congress's
authority to make laws governing federal labor relations and employment. Through
the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 <u>et</u> <u>seq.</u>—
the comprehensive scheme governing labor relations in the federal sector—Congress
gave federal sector labor organizations a significant portfolio of responsibilities
designed, among other things, to serve the public interest. Along with these
responsibilities, Congress gave labor organizations tools, such as official time, to aid
them in carrying out their obligations.

Sections 4(a)(i), (ii), and (v) of Executive Order Ensuring Transparency,
Accountability, and Efficiency in Taxpayer Funded Union Time Use undercut
Congress's policy determinations and, if given effect, would impermissibly restrict
one of those critical tools, official time, in conflict with 5 U.S.C. § 7131 and the
comprehensive collective bargaining regime provided in Chapter 71 of Title 5.
Section 4(c) of Executive Order Promoting Accountability and Streamlining
Removal Procedures Consistent with Merit System Principles likewise encroaches
upon Congress's authority and, if given effect, would override Congress's policy

decisions concerning federal employees' opportunities to demonstrate acceptable performance, embodied in 5 U.S.C. § 4302(c). In sum, the executive orders' core provisions interfere with federal statute and must be struck down as unlawful.

## JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.      Venue is proper in the Alexandria Division of this Court pursuant to 28 U.S.C. § 1391(e). NTEU represents thousands of employees who reside or work within the Alexandria Division who will be affected by the illegal actions described in this complaint. Thus, Plaintiff's injuries will occur, at least in substantial part, within the Alexandria Division.

## PARTIES

3.      Plaintiff NTEU is an unincorporated association with its principal place of business at 1750 H Street, N.W., Washington, D.C. 20006. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of approximately 150,000 federal employees in 32 federal departments and agencies. NTEU represents the interests of these employees by negotiating collective bargaining agreements; filing and arbitrating grievances under such agreements; filing unfair labor practices; petitioning Congress for favorable working conditions, pay, and benefits; and enforcing employees' collective and individual rights in federal courts.

4.     NTEU brings this action on behalf of itself and its members, whose rights will be violated by the executive orders issued by the defendant.

5.     Defendant Donald J. Trump is the President of the United States of America.  Defendant President Trump issued the executive orders challenged in this complaint, substantial portions of which exceed his authority and are invalid.

6.     Defendant Jeff T.H. Pon is the Director of the United States Office of Personnel Management (OPM).  The President has tasked OPM, and thus Defendant Pon, with either implementing or guiding the agencies' implementation of the challenged portions of the executive orders.  Because the challenged portions of the executive orders are invalid, no agent of the President, including Defendant Pon, may implement them.

7.     Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use, at Section 4(c)(i) provides that

> The Office of Personnel Management (OPM) shall be responsible for administering the requirements of this section.  Within 45 days of the date of this order, the OPM Director shall examine whether existing regulations are consistent with the rules set forth in this section.  If the regulations are not, the OPM Director shall propose for notice and public comment, as soon as practicable, appropriate regulations to clarify and assist agencies in implementing these rules, consistent with applicable law.

Similarly, Executive Order Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles, at Section 7(a), provides that

> [w]ithin 45 days of the date of this order, the OPM Director shall examine whether existing regulations effectuate the principles set forth in section 2 of this order and the requirements of sections 3, 4, 5, and 6 of this order.  To the extent necessary or appropriate, the OPM Director shall, as soon as practicable, propose for notice and public comment appropriate regulations to

4

effectuate the principles set forth in section 2 of this order and the requirements of sections 3, 4, 5, and 6 of this order.

## STATEMENT OF CLAIMS

I. **The Civil Service Reform Act and the Federal Service Labor-Management Relations Statute.**

8. Prior to 1978, federal employment was governed by an "outdated patchwork of statutes and rules built up over almost a century." United States v. Fausto, 484 U.S. 439, 444 (1988). Congress reacted to this state of disarray by enacting the Civil Service Reform Act of 1978 (the Act), which "comprehensively overhauled the civil service system." Lindahl v. Office of Pers. Mgmt., 470 U.S. 768, 773 (1985). The Act "prescribes in great detail the protections and remedies applicable . . ." to federal employees. Fausto, 484 U.S. at 443.

9. "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the [prior] regime." Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Rel. Auth., 464 U.S. 89, 107 (1983) (BATF).

10. Thus, as a central piece of this extensive federal civil service reform, Congress enacted the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 et seq. (the Statute), explicitly finding "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" to "safeguard[] the public interest" (5 U.S.C. § 7101(a)(1)).

11.     Through the Statute, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective bargaining agreements covering" not only their members, but <u>all</u> employees in the bargaining units that they were elected to represent.  5 U.S.C. § 7114(a).  Congress did so based upon its conclusion that the work of labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment."  5 U.S.C. § 7101(a)(1).

12.     The responsibility that Congress has bestowed on labor organizations, like NTEU, thus requires them to represent all employees in their bargaining units fairly, in good faith, and without discrimination, regardless of whether they have joined the union.  In NTEU's case, this means providing representation to approximately 150,000 bargaining unit employees working in 32 different federal departments and agencies.

A.     <u>Congress's Deliberate Decision to Expand Official Time.</u>

13.     To allow labor organizations to do what the Statute requires of them, Congress consciously, and dramatically, expanded upon the "official time" concept contained in the executive orders that governed federal sector labor-management relations prior to the Statute's enactment.  That concept allows union members what is known as "official time" for certain work-related functions involving agencies, labor organizations and the agency employees that they represent.  Hence,

Congress decided that managers and labor organizations can perform certain work-related functions during the work day, while being paid by the government.

14.     The events leading up to Congress's decision to expand official time show that Congress understood the value of official time.  The Legislative History of the Act shows that an early bill proposed in Senate would have retained then-existing restrictions on the authorization of official time.  See BATF, 464 U.S. at 101-02 (citing S. Rep. No. 95-969, at 112 (1978)).  But Congress, instead, adopted 5 U.S.C. § 7131 "in its present form."  Id. at 102.  Representative Clay, who co-introduced the bill that became the enacted legislation, stated emphatically that union negotiators "should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities."  Id. at 102 (quoting 124 Cong. Rec. 29188 (1978) (remarks of Rep. Clay) and citing H.R. Conf. Rep. No. 95-1717, at 111 (1978)).

15.     Through Section 7131 of Title 5, Congress made several deliberate policy decisions.  Congress rejected, completely, the limitations on official time in the executive orders that predated the Statute.  It chose, instead, to expressly provide for official time, without limitation, in two circumstances:  the negotiating of a collective bargaining agreement and the participation in a proceeding before the Federal Labor Relations Authority.  See 5 U.S.C. § 7131(a),(c).

16.     Congress did something else in Section 7131:  it purposefully left it to labor organizations and agencies to agree upon the other amounts of official time that are "reasonable, necessary, and in the public interest" (5 U.S.C. § 7131(d)).

Congress declared that once the union and agency agree on that amount, such official time "shall be granted." 5 U.S.C. § 7131(d).

17.     Congress further provided that the agreed upon amount of official time could be used by any employee representing the union or by any bargaining unit employee "in connection with any other matter covered by [the Statute]." 5 U.S.C. § 7131(d). In other words, official time could be used for any representational work, performed by a labor organization, or any other matter related to Chapter 71 of Title 5, so long as it did not relate to the union's "internal business," e.g., "solicitation of membership, election of labor organization officials, and collection of dues." 5 U.S.C. § 7131(b).

18.     In short, the policy decisions made by Congress through Section 7131 significantly expanded the categories of union work for which official time might be available beyond the executive orders that previously governed federal labor relations. Section 7131 also plainly marked a conscious shift by Congress to a new official time system that deferred to the will, experience, and expertise of the negotiating parties to a collective bargaining agreement. This new system mandated official time for certain purposes (5 U.S.C. § 7131(a), (c)) and delegated to labor organizations and agencies the right to bargain for other amounts of official time that they deem to be "reasonable, necessary, and in the public interest" (5 U.S.C. § 7131(d)).

19.     As shown, Congress deliberately, and significantly, expanded upon the concept of official time in the Statute, an expansion that better equipped labor

unions, serving as the exclusive representatives of bargaining units, to handle the broad portfolio of work that the Statute gave to them.

20.     Consistent with the Statute, NTEU has negotiated official time provisions in its collective bargaining agreements, including provisions that discuss allotments of official time and parameters for its use.  Section 7131(d) requires that those agreed upon amounts of official time "shall be granted."

**B.     Congress's 1978 Decision on Removals for Performance.**

21.     The comprehensive federal personnel scheme that Congress created through the Civil Service Reform Act establishes, among other things, processes for evaluating employee performance, including procedures for addressing the performance of an employee that drops below an acceptable level.

22.     In Section 4302 of Title 5, Congress directs agencies to develop one or more personnel appraisal systems that "(1) provide for periodic appraisals of job performance of employees; (2) encourage employee participation in establishing performance standards; and (3) use the results of performance appraisals as a basis for training, rewarding, reassigning, promoting, reducing in grade, retaining, and removing employees."

23.     Congress further provided in Section 4302 that, "[u]nder regulations which the Office of Personnel Management shall prescribe, each performance appraisal system shall provide for . . . reassigning, reducing in grade, or removing employees who continue to have unacceptable performance but only after an

opportunity to demonstrate acceptable performance." 5 U.S.C. 4302(c)(6) (emphasis added).

24.     The statutorily mandated "opportunity to demonstrate acceptable performance" (5 U.S.C. 4302(c)(6)) is commonly known as a "performance improvement period" (PIP).  Agencies must bargain with unions over conditions of employment to the extent that proposals are not inconsistent with federal law, government-wide statute, or rights that the Statute reserves for agency management.  See 5 U.S.C. §§ 7103(12),(14), 7106(a), 7117(a)(1).  Congress chose not to define the precise length of a PIP in Section 4302(c)(6) or its list of reserved management rights in the Statute (see 5 U.S.C. § 7106).  Agencies and unions may thus bargain over the appropriate length of a PIP or, put differently, how long a bargaining unit employee will have to "demonstrate acceptable performance" (5 U.S.C. § 4302(c)(6)) before being sanctioned for unacceptable performance.

25.     NTEU negotiates the length of PIPs in its collective bargaining agreements with agencies.  PIPs that NTEU bargains are frequently more than 30 days.  NTEU's contract with the Internal Revenue Service, for example, provides that "[p]rior to issuing a notice of proposed action based on unacceptable performance, the Employer will issue a letter to the employee which contains . . . a statement that the employee has a reasonable period of time (specified in days) but never less than sixty (60) days in which to bring performance up to an acceptable level."  Similarly, NTEU's contract with Customs and Border Protection provides that, prior to removing an employee for unacceptable performance, "[t]he employee

will be provided a reasonable period of time, at least sixty (60) days, to improve his/her performance to the Successful level." Section 4(c) of the order, if given effect, would jeopardize these contractual provisions by limiting PIPs to 30 days, unless agencies, in their sole and exclusive discretion, elect to extend those periods.

## II.     President Trump's Executive Orders.

26.     "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). "Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject." <u>Id.</u> at 637-38.

27.     Critical and substantial parts of two of the executive orders that President Trump issued on May 25, 2018, intrude upon an area that Congress occupies, conflict with Congress's express will, and cannot stand. Those executive orders are: "Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use" and "Executive Order Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles."

### A.     Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use.

28.     Section 4(a) of this executive order requires that "all employees shall adhere to" the "requirements" imposed by that section. Section 4(a) goes on to limit

official time quantitatively, in conflict with 5 U.S.C. § 7131. It also prohibits official time altogether in certain circumstances, again in conflict with 5 U.S.C. § 7131.

29. The President, through his Section 4(a) mandates, has exceeded the scope of his authority by intruding into the area of official time and disrupting the scheme that Congress has put into place through Section 7131 of Title 5. Congress has expressed, plainly, its will through this key provision, which is part of a larger, comprehensive scheme that it took great care in devising. Giving the subprovisions of Section 4(a) discussed below effect would serve to override Congress, allowing the President to usurp Congress's role in our system of government by curtailing key provisions of the Statute.

30. Section 4(a)(i) provides that "[e]mployees may not petition Congress in employee-related issues during paid time, except in their official capacities as an employee." This proscription conflicts with Section 7131. Through Section 7131(d), Congress has allowed official time to be provided for any activity related to union representation or related to any matter covered by the Statute, apart from those activities prohibited by Section 7131(b). Official time for petitioning Congress on issues related to federal employees or federal employment is thus allowable under the Statute.

31. NTEU's collective bargaining agreement with Customs and Border Protection, for example, explicitly allows for official time to petition Congress regarding certain "activities (e.g., visiting, phoning and writing to elected representatives) on matters concerning Union employees' conditions of

employment." Section 4(a)(i), if given effect, would upend provisions like this one or allow their termination.

32. Section 4(a)(v) states that employees "may not" use official time "to prepare or pursue grievances (including arbitration of grievances) brought against an agency under procedures negotiated pursuant to section 7121 of title 5, United States Code, except where such use is otherwise authorized by law or regulation." Section 4(v) further provides that this "prohibition" does not apply to (1) an employee using official time "to prepare for, confer with an exclusive representative regarding, or present a grievance brought on the employee's own behalf; or to appear as a witness in any grievance proceeding"; or (2) an employee using official time "to challenge an adverse personnel action taken against the employee in retaliation for engaging in federally protected whistleblower activity."

33. By declaring that employees are barred from using official time "to prepare or pursue grievances (including arbitration of grievances) brought against an agency" except when authorized by law or regulation, Section 4(a)(v) flatly conflicts with Section 7131, which expressly allows employee union representatives to use official time for such grievances whenever authorized by contract between the employee's exclusive representative and the employing agency.

34. Congress has required each federal sector collective bargaining agreement to include a negotiated grievance procedure. 5 U.S.C. § 7121(a)(1). Congress also decided that the negotiated grievance procedure must be broad in scope (5 U.S.C. § 7103(a)(9)), excluding only certain topics (5 U.S.C. § 7121(c)).

13

35.     Labor organizations like NTEU play a critical role in preparing and pursuing grievances.  Employees rely upon their unions to perform this role. Section 4(a)(v) would greatly hinder labor organizations like NTEU in preparing and presenting grievances on behalf of the employees that they represent.

36.     Illustrating the anomaly of Section 4(v), if it were given effect and an agency were to commit an unfair labor practice, as defined by Congress in Section 7116 of Title 5, union representatives would be denied official time to challenge that unfair labor practice through the grievance procedure that Congress has required them to negotiate to deal with disputes with the agency (5 U.S.C. § 7121(a)(1)).  The plain text of the Statute tells us that this was not what Congress intended. Congress wanted to aid labor organizations in performing their statutory representational roles, not make it harder for them to do what is required of them.

37.     Section 4(a)(ii) of the order provides the type of quantitative cap on official time that Congress consciously rejected in Section 7131 of Title 5.  The President, through this provision, contravenes Congress's statutory plan. Specifically, Section 4(a)(ii), at subparagraph 1, states that "[e]xcept as provided in subparagraph (2) of this subsection, employees shall spend at least three-quarters of their paid time, measured each fiscal year, performing agency business or attending necessary training."  Subparagraph 2 of the subsection provides that "[e]mployees who have spent one-quarter of their paid time in any fiscal year on non-agency business" may continue to use official time for the purposes outlined in 5 U.S.C. § 7131(a) and (c)—i.e., negotiating a collective bargaining agreement or

participating in a proceeding before the Federal Labor Relations Authority. But, under subparagraph 3 of the subsection, any official time spent in excess of 25% of one's paid time in any fiscal year—including time spent negotiating a collective bargaining agreement or participating in a Federal Labor Relations Authority proceeding—"shall count toward the limitation set forth in subparagraph (1) of this subsection in subsequent fiscal years." The annual official time limitation in Section 4(a)(ii) plainly contradicts Congress's scheme in Section 7131 of Title 5.

**B.** **Executive Order Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles.**

38. The President, through his mandates in Section 4(c) of this executive order, has exceeded the scope of his authority and would disrupt policy decisions that Congress has made in Section 4302(c)(6) of Title 5. Giving Section 4(c) effect would allow the President to usurp Congress's role in designing the Act.

39. Section 4(c) conflicts with two parts of Congress's comprehensive personnel scheme. It states that "no agency shall . . . generally afford an employee more than a 30-day period to demonstrate acceptable performance under section 4302(c)(6) of title 5, United States Code, except when the agency determines in its sole and exclusive discretion that a longer period is necessary to provide sufficient time to evaluate an employee's performance."

40. The imposition of a general, 30-day limitation on PIPs runs contrary to Section 4302(c)(6) of Title 5, which contains no temporal limitation on PIPs, but instead requires "an opportunity to demonstrate acceptable performance."

Implementing regulations issued by the Office of Personnel Management require this opportunity to be a "reasonable" one. 5 C.F.R. § 432.104.

### III.    The Harm that NTEU Will Suffer Due to the Executive Orders.

41.    NTEU brings this action on behalf of itself and the employees that it represents. The sections of the executive orders discussed above will injure both NTEU and those employees. These sections undermine NTEU and NTEU members' existing rights under their collective bargaining agreements, even though those contractual rights are entirely consistent with federal statute; the President has ordered federal agencies, at the earliest possible time, to renegotiate or terminate provisions in these contracts that conflict with the executive order mandates discussed above.

42.    NTEU and its members will be harmed by Sections 4(a)(i), (ii), and (v) of the Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use, which pertains to official time. These provisions will severely restrict the abilities of NTEU members to act as union representatives and will impair NTEU's ability to carry out its responsibility to ensure that employees are treated in accordance with applicable law, regulations, and collective bargaining agreements.

43.    The official time cap that Section 4(a)(ii) mandates would lead to union representatives being deterred from performing, or being rendered unable to perform, essential union functions, defeating the scheme that Congress enacted. As an initial matter, it will discourage union representatives from engaging in

activities for which official time is entirely appropriate because those employees will not want to exhaust their official time allotment prematurely. And, once the cap is hit, they will be financially harmed by having to use annual leave or leave without pay to perform currently permissible official time functions. This significant hindrance to union representatives will also harm the employees who depend upon their assistance.

44. Although Section 4(a)(ii) would allow employees who have hit the 25% of paid time cap on official time for the fiscal year to use additional official time to negotiate collective bargaining agreements and participate in Federal Labor Relations Authority proceedings, employees will certainly be deterred from performing even those vital functions. That is because, under Section 4(a)(ii)(3) of the executive order, time spent on these activities after the 25% of paid time cap is reached will count towards the next fiscal year's 25% of paid time cap. In practical terms, this will mean that a union representative would reach his or her official time cap even sooner in that next fiscal year. This, in turn, would preclude the union representative from using official time for otherwise permissible union functions that do not relate to collective bargaining or Federal Labor Relations Authority proceedings (i.e., official time that can currently be negotiated under Section 7131(d) of Title 5). This would be directly contrary to Congress's intent: Section 7131(d) declares that official time amounts negotiated by unions and agencies "shall be granted."

45.     Because official time would no longer be available for union representatives to prepare for or present grievances against the agency employer, the employees that NTEU represents will effectively be denied the opportunity to be represented by NTEU in those proceedings. NTEU's representatives routinely represent employees in grievance proceedings; this work is so substantial that it cannot effectively be done outside of business hours. And, due to Section 4(a), if done during business hours, union representatives would have to do this representational work while on annual leave or while on leave without pay; in other words, doing this work would come at a financial cost to them, which would deter the work from being done altogether.

46.     As a result, the employees that NTEU represents will be deprived of NTEU's expertise and resources in grievance proceedings, including, but not limited to, grievances challenging unlawful discrimination, unjust removals, or illegal pay practices. NTEU and its representatives routinely challenge unjust agency discipline and illegal pay practices with success through the grievance process. Official time would be prohibited for this work, even though it is plainly in the public interest to have improper agency actions of these types corrected.

47.     The sections of the executive orders discussed above, moreover, would unfairly diminish NTEU's bargaining power. NTEU would have to confront unreasonably restrictive official time proposals mandated by the President that are, as described above, contrary to the Statute. NTEU would also be confronted with mandatory agency proposals at odds with Section 4302(c)(6) of Title 5, which places

no temporal limitations on PIPs and does not relegate decisions concerning PIP

lengths to the sole and exclusive discretion of agencies.

48.     The employees that NTEU represents would be harmed by having the

PIPs in their contracts threatened by operation of Section 4(c) of Executive Order

Promoting Accountability and Streamlining Removal Procedures Consistent with

Merit System Principles, which would make it more difficult for them to show an

improvement in performance and, potentially, save their jobs.

## CAUSES OF ACTION

**Count 1**:  Sections 4(a)(i), (ii), and (v) of Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use Conflicts with 5 U.S.C. § 7131 and the Statute's Collective Bargaining Scheme

49.     Plaintiff reasserts the allegations contained in paragraphs 1 through

48 of this complaint as though contained herein.

50.     Courts have jurisdiction to grant relief when the President acts beyond

the scope of his or her authority and violates the law, to the injury of an individual

or organization.

51.     Sections 4(a)(i), (ii), and (v) interfere with various provisions expressly

prescribed by Congress.  Because Section 4(a)'s requirements conflict with Section

7131 of Title 5, giving them effect would override Congress and allow the President

to usurp Congress's lawmaking authority.

52.     Section 4(a)(i)'s provision that "[e]mployees may not engage in lobbying

activities during paid time, except in their official capacities as an employee"

conflicts with Section 7131.  Through Section 7131(d), Congress has allowed official

time to be provided for any activity related to union representation or related to any matter covered by the Statute, apart from those activities prohibited by Section 7131(b). NTEU has negotiated contracts that include provisions allowing for official time for certain lobbying activities. Section 4(a)(i) would require agencies to propose to terminate these provisions, to the detriment of employees.

53. By declaring that employees are barred from using official time "to prepare or pursue grievances (including arbitration of grievances) brought against an agency" except when authorized by law or regulation, Section 4(a)(v) flatly conflicts with Section 7131, which expressly allows employee union representatives to use official time for such grievances whenever authorized by contract between the employee's exclusive representative and the employing agency. NTEU's representatives routinely assist bargaining unit employees in grievance and arbitration proceedings and receive official time for doing so. Section 4(a)(v) would lead to agencies renegotiating or terminating contractual provisions that allow official time for such critical representational work.

54. Section 4(a)(ii)'s fiscal year cap on official time plainly contradicts Congress's scheme in Section 7131 of Title 5, which, unlike the superseded executive orders that the Statute supplanted, contains no quantitative limits on the use of official time. Consistent with the Statute, NTEU's collective bargaining agreements generally allow for an individual union representative to spent more than 25% of his or her paid time in a fiscal year on official time. Section 4(a)(ii), if

valid, would allow agencies to renegotiate or to terminate these provisions, even though they are authorized by, and entirely consistent with, the Statute.

55.     Sections 4(a)(i), (ii), and (v) would undermine the collective bargaining regime that the Statute establishes by substituting the judgment of the President for that of those to whom Congress has given the responsibility of bargaining over official time pursuant to Section 7131(d) of Title 5.

56.     Sections 4(a)(i), (ii), and (v) would bestow upon the President power that Congress intended the Federal Labor Relations Authority to exercise:  the power to determine which activities are the proper subject of official time negotiations under Section 7131(d) of Title 5.

## Count 2:  Section 4(c) of Executive Order Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles Conflicts with 5 U.S.C. § 4302(c)(6)

57.     Plaintiff reasserts the allegations contained in paragraphs 1 through 48 of this complaint as though contained herein.

58.     Courts have jurisdiction to grant relief when the President acts beyond the scope of his or her authority and violates the law, to the injury of an individual or organization.

59.     Section 4(c) of the order, intrudes into an area that Congress occupies through the Statute.  Because Section 4(c) conflicts with Section 4302(c)(6) of Title 5, giving it effect would serve to override Congress and to allow the President to usurp Congress's lawmaking authority.

60. Section 4(c)'s 30-day limitation on PIPs is contrary to Section 4302(c)(6) of Title 5, which contains no temporal limitation on PIPs.

61. Section 4(c)'s declaration that extensions of PIPs beyond 30 days shall be left to the "sole and exclusive discretion" of the agency employer conflicts with Section 7106 of Title 5. Congress deliberately chose not to include the appropriate length of a PIP in its list of non-negotiable, reserved management rights in Section 7106. Section 4(c) would bestow upon the President power that Congress intended the Federal Labor Relations Authority to exercise: the power to determine what aspects of PIPs are the proper subject of bargaining.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, based on the foregoing, Plaintiff NTEU requests judgment against Defendant President Donald J. Trump and Defendant Pon:

A. Declaring that Sections 4(a)(i), (ii), and (v) of Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use are unlawful.

B. Declaring that Section 4(c) of Executive Order Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles is unlawful.

C. Enjoining Defendant President Trump or his subordinates, including Defendant Pon, from enforcing Sections 4(a)(i), (ii), and (v) of Executive Order Ensuring Transparency, Accountability, and Efficiency in Taxpayer Funded Union Time Use.

22

D.     Enjoining Defendant President Trump or his subordinates, including Defendant Pon, from enforcing Section 4(c) of Executive Order Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles.

E.     Awarding Plaintiff reasonable attorney fees and costs incurred.

F.     Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

/s/ Bernard J. DiMuro

_____

Bernard J. DiMuro
Virginia Bar No. 18784
Jonathan R. Mook
Virginia Bar No. 19177
Jayna Genti
Virginia Bar No. 90065
DIMUROGINSBERG, PC
1101 King Street, Suite 610
Alexandria, VA 22314
Tel: (703) 684-4333
Fax: (703) 548-3181
Email: bdimuro@dimuro.com
Email : jmook@dimuro.com
Email: jgenti@dimuro.com

Attorneys for Plaintiff NTEU

/s/ Gregory O'Duden

_____

Gregory O'Duden (pro hac vice application pending)
Larry J. Adkins (pro hac vice application pending)
Paras N. Shah (pro hac vice application pending)
Allison C. Giles (pro hac vice application pending)

NATIONAL TREASURY EMPLOYEES UNION
1750 H Street, N.W.
Washington, D.C. 20006
Tel: (202) 572-5500
Fax: (202) 572-5645
Email: greg.oduden@nteu.org
Email: larry.adkins@nteu.org
Email: paras.shah@nteu.org
Email: allie.giles@nteu.org

Attorneys for Plaintiff NTEU

/s/ April Pullium

_____

April Pullium
Virginia Bar No. 90994
BREDHOFF & KAISER PLLC
805 15th Street N.W.
Suite 1000
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
Email: apullium@bredhoff.com

Attorney for Plaintiff NTEU

June 1, 2018

## CERTIFICATE OF SERVICE

I certify that, on June 1, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Eastern District of Virginia through the CM/ECF system.  I further certify that service was accomplished pursuant to the Court's electronic filing procedures.


 /s/  Bernard J. DiMuro
Bernard J. DiMuro
Virginia Bar No. 18784
DIMUROGINSBERG, PC
1101 King Street, Suite 610
Alexandria, Virginia 22314
Tel:  (703) 684-4333
Fax:  (703) 548-3181
Email:  bdimuro@dimuro.com

Attorney for Plaintiff